Bryan Hurlbutt (ISB # 8501)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org

Roger Flynn (*pro hac vice pending*)
WESTERN MINING ACTION PROJECT
P.O. Box 349
Lyons, CO 80540
(303) 823-5738
(303) 823-5732 (fax)
wmap@igc.org

*Attorneys for Plaintiff Idaho Conservation League*

Michael A. Lopez (ISB # 8356)
David J. Cummings (ISB # 5400)
NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL
P.O. Box 305
Lapwai, ID 83540
(208) 843-7355
(208) 843-7377 (fax)
mikel@nezperce.org
djc@nezperce.org

*Attorneys for Plaintiff Nez Perce Tribe*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IDAHO CONSERVATION LEAGUE, and<br>NEZ PERCE TRIBE | ) ) ) | No. 14-cv-156 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **COMPLAINT** |
| U.S. FOREST SERVICE,<br>NOAA FISHERIES, and<br>U.S. FISH & WILDLIFE SERVICE | ) ) ) ) | |
| Defendants. | ) ) | |

## NATURE OF THE ACTION

1.      Plaintiffs Idaho Conservation League and Nez Perce Tribe challenge the

U.S. Forest Service's approval of the Golden Meadows Exploration Project (Project) for

violations of the National Environmental Policy Act (NEPA).  The Project is a three-year

mineral exploration project on the Payette and Boise National Forests in Valley County,

Idaho, proposed by Canadian mining company Midas Gold, Inc. (MGI).

2.      The Forest Service, over Plaintiffs' administrative objections, authorized

the Project through a Decision Notice and Finding of No Significant Impact (DN/FONSI)

issued by the Krassel District Ranger on or around December 3, 2013, and based on an

Environmental Assessment (EA) issued in or around July 2013.

3.      Plaintiffs also challenge NOAA Fisheries' (NOAA) and the U.S. Fish and

Wildlife Service's (FWS) final determinations, through Letters of Concurrence (LOCs)

issued on or around October 18, 2012, and October 5, 2012, respectively, that the Project

is not likely to adversely affect fish species listed as threatened under the Endangered

Species Act or destroy or adversely modify their critical habitat.

4.      The DN/FONSI authorizes MGI to clear 26 drill areas and drill

approximately 178 holes at the Project site located in Valley County at the headwaters of

the East Fork of the South Fork of the Salmon River (EFSFSR) to evaluate the feasibility

of developing three open pit gold mines at the site.

5.      The Project requires a substantial amount of equipment, personnel, and

supplies to be hauled to the site year-round, even during snowy, icy, and muddy

conditions.  As approved, MGI would make up to 43,800 "one-way trips" to the Project

site over three years.  MGI would make nearly 1,000 fuel haul trips to transport up to

three million gallons of fuel to the site.  Each fuel haul trip involves driving a truck carrying either 4,000 gallons or 500 gallons of fuel for approximately 73 or 85 miles mostly on narrow, steep, windy roads along the South Fork of the Salmon River and two of its tributaries, the EFSFSR and Johnson Creek.

6.      The Project site and transportation route along the EFSFSR, and substantial segments of the transportation routes along the South Fork of the Salmon River and Johnson Creek, are located entirely within the exclusive aboriginal territory of Plaintiff Nez Perce Tribe (Tribe).  Since time immemorial, Nez Perce Tribal members have used and enjoyed these lands for subsistence, ceremonial, cultural, aesthetic, scientific, religious, and economic purposes.  In the 1855 Treaty with the United States, the Tribe reserved to itself, and the United States secured to the Tribe, fishing, hunting, gathering, and pasturing rights, including lands and waters now encompassing the Project site and transportation routes within the Payette and Boise National Forests.  These activities still play a major role in the culture, livelihood, and economy of the Nez Perce Tribe.

7.      The South Fork of the Salmon River and its tributaries are home to important populations of Chinook salmon, steelhead, and bull trout.  Due to the threat of extinction, each of these species is listed as "threatened" under the ESA.  These fish migrate, spawn, and rear in streams at the Project site and adjacent to MGI's transportation routes.  The Forest Service has acknowledged that the South Fork Salmon River Watershed is home to the most important remaining habitat for summer Chinook salmon in the entire Columbia River Basin.

8.     Despite the large scale of the Project and its negative impacts—particularly the impacts associated with the substantial increase in traffic on the environmentally-sensitive transportation routes—the Forest Service approved the Project using an EA and FONSI, rather than preparing a full Environmental Impact Statement (EIS) as required by NEPA.

9.     The Forest Service also violated NEPA by failing to take a "hard look" at the adverse impacts of the Project in the EA and DN/FONSI.  The Forest Service never disclosed or evaluated baseline traffic, accident, and road maintenance information necessary to evaluate the potential impacts of MGI's 43,800 one-way vehicle trips to the site.  Yet the Forest Service concluded that this increase in traffic and related impacts would be insignificant.

10.     The Forest Service also failed to evaluate and disclose how threatened fish species and other aquatic resources would be adversely affected by increased sediment caused by MGI's vehicle trips.  Elevated sediment levels are a longstanding problem in the South Fork Salmon River Watershed.  Erosion from dirt and gravel roads has been documented to be the largest anthropogenic source of sediment in the watershed.  The South Fork Salmon River, Johnson Creek, and EFSFSR have all been listed by the State of Idaho as "impaired" under the Clean Water Act due to excessive sediment.  And NOAA has found that even small increases in sediment in these streams may have significant impacts to fish.

11.     In the EA, the Forest Service acknowledged that increases in sediment can adversely impact Chinook salmon, steelhead, and bull trout and impair their reproductive success.  And the Forest Service admitted that increased vehicle traffic increases the

amount of sediment delivered to nearby streams.  But in the EA, the Forest Service improperly limited its analysis to sediment impacts at the Project site, and failed to even acknowledge or evaluate increased sediment caused by MGI's up to 43,800 vehicle trips on the transportation routes.

12.     MGI's vehicle trips would occur year-round and require driving from around 14 miles to up to 80 miles to reach the Project site from Yellow Pine, McCall, and Cascade.  The majority of all vehicle travel is on erodible native surface (dirt) and gravel roads in close proximity to streams where ESA-listed fish are present year-round.  The Forest Service has methodologies it regularly uses to evaluate sediment delivery from National Forest roads.  But the Forest Service never evaluated how much sediment would be generated and mobilized by MGI along the transportation routes and never considered the adverse impacts to ESA-listed fish and other aquatic resources, in violation of NEPA.

13.     The Forest Service also failed to adequately evaluate the risk of a fuel spill, in violation of NEPA.  The Forest Service authorized MGI to transport up to one million gallons of fuel to the Project site each year.  MGI would deliver fuel year-round, making nearly 1,000 fuel truck trips over the life of the Project.  MGI would transport fuel on two routes for around 70 or 80 miles to reach the site from Cascade.  Both routes are primarily on steep, windy, single-lane roads.  Accidents, including fuel spills, have occurred along these routes, and a single fuel spill may have a devastating impact on ESA-listed fish and other aquatic resources in adjacent streams.  Instead of evaluating the likelihood of a fuel truck accident, the Forest Service simply claimed in the EA and DN/FONSI that the risk would be extremely low.

14.     Notably, since the 1990s, the Forest Service and NOAA have acknowledged the substantial risks to listed fish from sediment and fuel spills caused by hauling fuel along MGI's two fuel routes.  Taking caution against these risks, the Forest Service and NOAA have implemented strict limitations on the amount and timing of fuel on these routes for other projects.  Here, however, MGI would not follow important prior restrictions, yet the Forest Service and NOAA concluded that the risk of a fuel spill would be very low without reasonable explanation.

15.     The Forest Service also failed to adequately disclose the baseline conditions and ongoing impacts of previous mining activities in the EFSFSR watershed, in violation of NEPA.  For example, the Project area contains a vast network of tunnels, adits, abandoned bore holes, and other underground workings from previous mining activities, but the Forest Service failed to consider how those numerous underground workings affect the geology, soil, groundwater hydrology, and other environmental conditions in the Project area.  Moreover, the Project site itself includes an area that was eligible for Superfund listing due to its significant, ongoing environmental problems. While some remediation has occurred in the watershed, water quality problems persist and continue to impact ESA-listed fish and other aquatic resources.  The Forest Service, however, failed to adequately disclose these conditions and consider these ongoing impacts in connection with MGI's Project.

16.     The Forest Service also failed to take a hard look in the EA and DN/FONSI at the cumulative impacts of MGI's Project when added to the impacts of past, present, and reasonably foreseeable actions, in violation of NEPA.  For example, fuel trucks and other vehicles from the Golden Hand No. 1 and No. 2 Lode Mining

Claims Project (Golden Hand project) would use MGI's transportation routes.  But the Forest Service failed to disclose this increase in traffic and never assessed the additional sediment and risk of a fuel spill related to Golden Hand.

17.     The Forest Service also violated NEPA by failing to consider a reasonable range of alternatives.  Prior to approving the Project, Plaintiffs asked the Forest Service to consider whether using alternate transportation routes, authorizing winter-only drilling, prohibiting fuel haul during the critical "spring break up" period, and other alternative ways of approving MGI's Project would minimize sediment delivery, the risk of a fuel spill, and other adverse impacts.  However, the Forest Service evaluated MGI's proposal without developing or evaluating any recommended alternatives in the EA.

18.     The Forest Service also prepared a Biological Assessment (BA) for the Project to evaluate impacts to ESA-listed species and initiated ESA consultation with NOAA and FWS.  In the BA, the Forest Service failed to adequately evaluate the impacts of increased sediment and fuel spills along the Project's transportation routes. Nevertheless, NOAA concurred with the Forest Service's finding that the Project may affect but is not likely to adversely affect threatened Chinook salmon and steelhead or their critical habitat.  Similarly, FWS concurred with the Forest Service's finding that the Project may affect but is not likely to adversely affect threatened bull trout or its critical habitat.

19.     NOAA's and FWS's LOCs are arbitrary and capricious because those agencies overlooked the shortcomings in the Forest Service's Biological Assessment, relied on inaccurate and unverified assumptions, and failed to adequately evaluate the Project's impacts.

20.     Notably, in 1995, when NOAA evaluated Stibnite Mining Inc.'s proposal to haul similar quantities of fuel to the site, NOAA determined that the project warranted formal ESA consultation and prepared a Biological Opinion (BiOp).  In the BiOp, NOAA found that the risk of a fuel spill and the increase in sediment from the proposal would have been serious, so NOAA imposed numerous restrictions on fuel haul and road maintenance in order to sufficiently avoid these risks.  Here, however, instead of conducting formal consultation and preparing BiOps, NOAA and FWS issued LOCs through informal consultation—even though MGI has been authorized to haul similar quantities of fuel on the same routes without following important restrictions in the Stibnite Mining BiOp.

21.     Based on these violations of law, Plaintiffs request that this Court vacate, reverse, and remand the Golden Meadows EA, DN/FONSI, and LOCs, and enter other relief as prayed for below.

## JURISDICTION AND VENUE

22.     Jurisdiction is proper in this Court under 18 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 *et seq.*; the ESA, 16 U.S.C. § 1531 *et seq.*; the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (APA); the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. § 2214 *et seq.*

23.     An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is therefore proper under 5 U.S.C. §§ 701–06; 28 U.S.C. §§ 2201–02; and 16 U.S.C. § 1540(g).

24.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiffs reside in this district, Defendants have offices in this district, and the public lands and resources in question are located in Idaho.

25.     The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

26.     Plaintiff IDAHO CONSERVATION LEAGUE (ICL) is a non-profit conservation organization incorporated under the laws of Idaho with its principal place of business in Boise, Idaho.  ICL's mission is to protect Idaho's clean water, clean air, healthy families, and quality of life.

27.     ICL and its approximately 20,000 supporters are dedicated to protecting and conserving Idaho's natural resources, including its water resources and aquatic life. ICL staff, members, and supporters are active in public education, administration, and legislation of conservation issues in Idaho, including issues related to mining, water, and fish.  As an organization, and on behalf of its staff, members, and supporters, ICL is greatly concerned with protecting and improving the quality of Idaho's surface waters, including the Salmon River Basin, and with recovering and sustaining viable populations of ESA-listed fish species.

28.     ICL staff, supporters, and members regularly use and enjoy the Payette and Boise National Forests, including the Project site, the Project transportation routes, and other affected waters and lands in the South Fork Salmon River Watershed, for health, recreational, scientific, and aesthetic purposes.  ICL staff, members, and

supporters derive health, recreational, scientific, and aesthetic benefits from drinking,

fishing, boating, study, contemplation, photography, and other activities in the South

Fork Salmon River Watershed.  ICL staff, members, and supporters intend to continue to

visit and use public lands in the South Fork Salmon River Watershed in the near future.

29.     These interests of ICL and its staff, members, and supporters are directly

affected by the Forest Service's action approving the Golden Meadows Exploration

Project without adequately assessing the potential environmental impacts as challenged

here.  These interests are also directly affected by NOAA's and FWS's actions

challenged here.  These interests have been, are being, and will continue to be irreparably

injured by these legal violations unless the relief prayed for herein is granted.

30.     Plaintiff NEZ PERCE TRIBE (Tribe) is a federally recognized Indian tribe

headquartered in Lapwai on the Nez Perce Reservation.  Since time immemorial, the

Tribe and its Tribal members have used and enjoyed the lands and waters of the Salmon

River Basin, including  areas now encompassing the Payette and Boise National Forests.

31.     In 1855, the Tribe negotiated a treaty with the United States.  Treaty of

June 11, 1855 with the Nez Perce Tribe, 12 Stat. 957 (1859)(1855 Treaty).  Article 3 of

the 1855 Treaty explicitly reserved to the Tribe certain rights, including the exclusive

right to take fish in streams running through or bordering the Reservation, and "the right

to fish at all usual and accustomed places in common with citizens of the Territory; and

of erecting temporary buildings for curing, together with the privilege of hunting,

gathering roots and berries, and pasturing their horses and cattle upon open and

unclaimed lands."

32.     The Tribe has a significant interest in the Forest Service's administration and regulation of the Payette and Boise National Forests.  The Forest provides important habitat for treaty-reserved aquatic species such as salmon, steelhead, and bull trout; wildlife such as bighorn sheep, elk, deer, and bear; and culturally-significant roots and berries.   When not prevented from doing so by the Project, the Tribe and its members derive subsistence, ceremonial, recreational, aesthetic, scientific, commercial, cultural, and spiritual benefits from the land and resources of the Payette and Boise National Forests that comprises part of the Tribe's vast aboriginal territory and on which the Tribe enjoys access to, and exercise of, treaty-reserved rights.

33.     As co-manager of its treaty-reserved resources, the Tribe is substantially involved in the management, restoration, and protection of its fisheries, including Chinook salmon, steelhead and bull trout that spawn and rear in waters within and adjacent to the Project area.  The Tribe implements millions of dollars a year in fish restoration activities on National Forest Service land, including areas in and adjacent to the Project area within the Payette and Boise National Forests, that benefit the fish resource for the tribal and non-tribal communities alike.

34.     The Tribe and its members intend to continue to derive subsistence, ceremonial, recreational, aesthetic, scientific, commercial, cultural, and spiritual benefits from the land and resources of the Payette and Boise National Forests, including the Project site, the Project transportation routes, and other affected waters and lands in the South Fork Salmon River Watershed.  The Tribe also intends to continue to implement fish management, restoration, and protection activities in these Forests, including in the South Fork Salmon River watershed.  The past, present, and future enjoyment of these

benefits by the Tribe and its members has been, is being, and will continue to be harmed

by Defendants' violations of law, for which judicial relief is required to remedy the harm

caused to the Tribe.

35.     Defendant U.S. FOREST SERVICE (Forest Service) is an agency or

instrumentality of the United States and is charged with managing the public lands and

resources of the Payette and Boise National Forests in accordance and compliance with

federal laws and regulations.

36.     Defendant NOAA FISHERIES (also referred to as the National Marine

Fisheries Service, or NMFS) is an agency or instrumentality of the United States and is

responsible for administering the provisions of the ESA with regard to threatened marine

species, including Snake River spring/summer Chinook salmon and Snake River Basin

steelhead.

37.     Defendant U.S. FISH AND WILDLIFE SERVICE (FWS) is an agency or

instrumentality of the United States and is responsible for administering the provisions of

the ESA with regard to threatened and endangered terrestrial and freshwater aquatic

species, including threatened Columbia River bull trout.

## LEGAL BACKGROUND

**The Organic Act**

38.     The Forest Service Organic Administration Act of 1897 requires the

Forest Service to regulate the "occupancy and use" of the national forests and to

"preserve the forests thereon from destruction."  16 U.S.C. § 551.  Federal regulations

require that mining activity "shall be conducted so as, where feasible, to minimize

adverse environmental impacts on National Forest surface resources".  36 C.F.R. § 228.8.

The mining operator's plan of operations must describe how the operator intends to meet these regulatory requirements for environmental protection.  36 C.F.R. § 228.4(c)(3). Operators must also "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."  36 C.F.R. § 228.8(e).

**The National Forest Management Act**

39.    Under the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, the Forest Service must develop and follow Land and Resource Plans (commonly called Forest Plans) for each National Forest.  16 U.S.C. §§ 1604(a), (e) & (g)(3)(B). NFMA and its implementing regulations require that all management actions approved by the Forest Service must be consistent with the applicable Forest Plan.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).  The Payette National Forest has adopted a revised Forest Plan which contains standards for managing mineral resources.

**The National Environmental Policy Act**

40.    NEPA is America's basic "charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA serves two purposes: (1) "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) it "guarantees that the relevant information will be made available" to the public so it may play a role in the decisionmaking process.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

41.    Under NEPA, federal agencies must take a "hard look" at the environmental consequences of their actions before action is taken.  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).  Taking a hard

look requires the agency to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). The hard look doctrine bars "[g]eneral statements about 'possible effects' and 'some risk' . . . absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). This "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349.

42.     To fulfill the hard look requirement, agencies must prepare an EIS (a comprehensive study of alternatives and environmental impacts) for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As a preliminary step, an agency may prepare an EA to determine whether an EIS is required. 40 C.F.R. § 1508.9. An EIS is required when there are substantial questions about whether a project "may" significantly degrade the environment. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005). "[T]his is a low standard." *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011).

43.     Whether an agency prepares an EA or an EIS, the agency must provide adequate information on the baseline conditions of the affected environment. *See N. Plains Res. Council v. Surface Transp. Board*, 668 F.3d 1067, 1083–85 (9th Cir. 2011). "Without establishing the baseline conditions which exist . . . there is simply no way to determine what effect the proposed [action] will have on the environment and,

consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Mark't Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

44.     Agencies must also consider the "cumulative impacts" of the proposed action in an EA or an EIS. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002). "Cumulative impacts" are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "[A]ny future project, once proposed [is] subject to NEPA's cumulative effects analysis." *Lands Council v. Powell*, 395 F.3d 1019, 1023 (9th Cir. 2005).

45.     Agencies must also "study, develop, and describe appropriate alternatives" to the proposed course of action when preparing an EA or an EIS. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). The "consideration of alternatives is critical to the goals of NEPA" and furthers those goals "by guaranteeing that agency decisionmakers have before them and take into proper account all possible approaches to a particular project." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir. 1988).

**The Endangered Species Act**

46.     The ESA is the nation's preeminent wildlife protection law. It was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species." 16 U.S.C. § 1532(b). The ESA was "designed to

prevent the loss of any endangered species, regardless of the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 n.34 (1978) (emphasis in the original).

47.     Under the ESA, the Secretary of the Interior or Commerce lists a species as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range," or as "threatened" if it is "likely to become an endangered species within the foreseeable future."  16 U.S.C. §§ 1533(a)(1), 1532(6) & (20).  Concurrently with listing a species as threatened or endangered, the Secretary also must designate "critical habitat" for the species.  16 U.S.C. § 1533(a)(3).  Critical habitat is the area that contains the physical or biological features essential to the conservation of the species and which may require special protection or management considerations.  16 U.S.C. § 1532(5)(A).

48.     ESA Section 7(a)(2) requires all federal agencies "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [designated critical] habitat."  16 U.S.C. § 1536(a)(2).

49.     To fulfill Section 7(a)(2)'s mandate, the "action agency" must consult with NOAA or FWS if a proposed action "may affect" a listed species or its critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  NOAA is responsible for consultations regarding anadromous fish species, including salmon and steelhead; FWS is responsible for inland fish species, including bull trout.  *See id.* § 402.01.

50.     To initiate consultation for a proposed action which may affect a listed species or its critical habitat, the action agency prepares a biological assessment (BA) to evaluate the potential effects of the action on listed species and to determine whether a species or its critical habitat is "likely to be adversely affected" (LAA) or "not likely to

be adversely affected" (NLAA) by the action.  50 C.F.R. § 402.12.  For LAA actions, the

action agency must seek "formal" consultation with NOAA or FWS.  50 C.F.R. §

402.14(a).  For NLAA actions, the action agency may seek "informal" consultation with

NOAA or FWS.  *See id.* § 402.14(b).

51.    During informal consultation, if NOAA or FWS issues a written

determination concurring with the action agency's NLAA finding, then the consultation

process is terminated and no further action is necessary.  50 C.F.R. § 402.13.  If NOAA

or FWS does not concur with the NLAA finding, then the action agency must initiate

formal consultation.  *See* 50 C.F.R. 402.14(a) & (b).  A letter of concurrence is only

appropriate when the BA or other information demonstrates that the action has no

likelihood of adverse effect to the listed species.  *Id.  See also, Endangered Species*

*Consultation Handbook*, FWS & NMFS (1998), p. 3-12.

**The Administrative Procedure Act**

52.    Under the Administrative Procedure Act (APA), a reviewing court shall

hold unlawful and set aside agency action, findings, and conclusions found to be:

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

contrary to constitutional right, power, privilege, or immunity; in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right; or without observance of

procedure required by law.  5 U.S.C. § 706(2).  Forest Service final agency action under

NEPA, and NOAA and FWS discretionary final agency actions under the ESA, are

reviewed under the APA's "arbitrary and capricious" standard.  *See Bennett v. Spear*, 520

U.S. 154, 174–75 (1997).

## STATEMENT OF FACTS

**The Golden Meadows Exploration Project**

53.     In January 2012, a private Canadian mining exploration company, Midas Gold Inc. (MGI), submitted an application to the Forest Service seeking approval to explore for minerals in the Payette and Boise National Forests.  MGI's three-year mineral exploration project (the Golden Meadows Exploration Project or "Project") would occur at the headwaters of the East Fork South Fork Salmon River (EFSFSR) within the Stibnite-Yellow Pine Mining District in Valley County, Idaho, approximately 14 miles east of the town of Yellow Pine.

54.     The Stibnite-Yellow Pine Mining District encompasses areas that have been heavily degraded and contaminated by previous mining activities, including open pit mining and cyanide heap leaching.  These historic mining activities resulted in many acres of disturbed land, which have delivered high levels of sediment to nearby streams. These activities also caused heavy metal contamination in the area, prompting the Environmental Protection Agency in 2001 to recommend that the Stibnite-Yellow Pine site be added to the National Priorities List (also referred to as Superfund).  While the site was never listed (the State of Idaho did not consent to the listing) some remediation has occurred.  However, metal contamination and sediment sources persist and continue to impact aquatic resources.

55.     In response to MGI's proposal, the Forest Service undertook a NEPA analysis, and issued the final EA and DN/FONSI in December 2013, approving the Project.  The EA and DN/FONSI are the Forest Service decision documents challenged here.

56.     As approved, MGI would drill approximately 178 exploratory holes in 26 drill areas on the National Forest.  MGI would use helicopters and vehicles to access drill areas.  In the drill areas, MGI would construct approximately 139 drill pads, where exploratory drilling would take place.  Drill pads would have mud sumps, where drilling fluids and drill cuttings would be placed and buried.  MGI would also expand a borrow source on National Forest land and undertake exploration and related activities on private land at the Project site.

57.     MGI would make up to 43,800 one-way vehicle trips to the Project site to transport staff, equipment, and supplies year-round to support its activities during the three-year Project.  The site would be accessed by three transportation routes on Forest Service roads.  Each route requires travel on narrow, windy roads in close proximity to, and in many areas directly adjacent to, the South Fork Salmon River, Johnson Creek, the EFSFSR, and other streams that are home to threatened Chinook salmon, steelhead, and bull trout, as described in more detail below.

58.     MGI's operations require large quantities of fuel (including diesel, gasoline, and jet fuels) to operate drill rigs, vehicles, and helicopters.  Over three years, MGI would make nearly 1,000 truck trips to deliver up to 3 million gallons of fuel to the Project site.  Fuel haul would primarily occur in trucks carrying 4,000 gallons of fuel each.  MGI would use two of the transportation routes from Cascade to haul fuel for about 70 or 80 miles to the Project site, as described in more detail below.

59.     Plaintiffs submitted extensive public comments to the Forest Service on the draft EA.  Plaintiffs filed timely objections, which the Forest Service denied.  The Tribe engaged in government-to-government consultations with the Forest Service,

requesting that the Forest Service address the shortcomings in the agency's evaluation of the Project, as identified in the Tribe's comments and objection.  The Forest Service failed to resolve the Tribe's outstanding concerns and instead authorized the Project.

60.     The Forest Service also initiated ESA consultation for the Project by submitting a Biological Assessment (BA) to NOAA and FWS in August 2012, and submitting an addendum to the BA in September 2012.  NOAA and FWS concluded the consultation process by issuing LOCs in October 2012, which are the NOAA and FWS final agency actions challenged here.  The Tribe met with NOAA in December 2013 to convey its concerns about NOAA's informal consultation and LOC for the Project.

**ESA-Listed Fish in the Impacted Area**

61.     The Project site and the majority of each transportation route lie within the South Fork Salmon River Watershed.  Three species of fish listed as "threatened" under the Endangered Species Act are found in the watershed: Chinook salmon; steelhead; and bull trout.  Fish from each of these species are present year-round in the South Fork Salmon River, Johnson Creek, and the EFSFSR along the transportation routes and up to the Project site.

Snake River Spring/Summer Chinook Salmon

62.     The Snake River spring/summer Chinook salmon (Chinook salmon or Chinook) was protected as "threatened" under the ESA in 1992.  Historically, 1.5 million Chinook returned to spawn in the Snake River Basin, but these returns have declined by as much as 97 percent since the late 1800s.  Chinook salmon have been extirpated in over half of their pre-European spawning range within the Snake River Basin.  Today, hatchery-raised fish comprise up to 80 percent of the Snake River spring/salmon run.

63.     Historically, the Salmon River, which is within the Snake River Basin, produced between 39 and 45 percent of the total Columbia River spring/summer Chinook salmon adults.  The South Fork Salmon River Watershed contains substantial and important remaining habitat for Chinook salmon and is one of the management population groups in the Snake River Evolutionarily Significant Unit.

64.     Critical habitat was designated for Chinook salmon in 1993 and was revised in 1999.  Chinook salmon critical habitat includes all river reaches presently or historically accessible by Chinook salmon and adjacent riparian zones (i.e. 300 feet on either side of the normal high water line).  Designated critical habitat for Chinook salmon includes the South Fork Salmon River, Johnson Creek, the EFSFSR, Sugar Creek, Lick Creek, and the Secesh River, as well as the segments of MGI's transportation routes adjacent to these waterways.

Steelhead

65.     The Snake River Basin steelhead trout (steelhead) was protected under the ESA as a threatened species in 1997 and includes all natural-origin populations of steelhead in the Snake River Basin of southeast Washington, northeast Oregon, and Idaho.  NOAA designated critical habitat for steelhead in 2005.  Snake River Basin steelhead critical habitat includes the South Fork Salmon River, Johnson Creek, Sugar Creek, Lick Creek, and segments of MGI's transportation routes adjacent to these waterways.

Bull Trout

66.     The Columbia River bull trout was listed as threatened under the ESA in 1998.  FWS designated critical habitat for bull trout in 2010, which includes the South

Fork Salmon River, Johnson Creek, the EFSFSR, Sugar Creek, Meadow Creek, and Lick Creek.  Bull trout have been documented to migrate, spawn, and rear in these streams.

67.     There is little data on population size and trends of bull trout in the South Fork Salmon River, but bull trout are generally assumed to be in decline across their historic range.

**MGI's Three Transportation Routes to the Site**

68.     The Forest Service has authorized MGI to use three transportation routes to access the Project site.  All of the transportation routes follow streams that have ESA-listed Chinook salmon, steelhead, and bull trout present year-round and pass through designated critical habitat for many miles.  Two transportation routes originate in the City of Cascade: the approximately 97-mile "South Fork Salmon River Route"; and the approximately 79-mile "Johnson Creek Route."  The third transportation route originates in McCall: the approximately 63-mile "Lick Creek Route."  The majority of each transportation route is on National Forest Lands; however, several of the roads are maintained or managed by Valley County through agreement or easements issued under the Federal Roads and Trails Act, 16 U.S.C. §§ 532–538.

South Fork Salmon River Route

69.     To access the Project site using the "South Fork Salmon River Route", MGI would travel from the City of Cascade on the paved "Warm Lake Road" for 23 miles; then on the paved "South Fork Road" for 32 miles adjacent to the South Fork Salmon River; then on the native surface and gravel "East Fork Road" for approximately 16 miles adjacent to the EFSFSR; and then on the native surface and gravel "Stibnite

Road" for approximately 14 miles adjacent to the EFSFSR from the town of Yellow Pine to the Project site.

Johnson Creek Route

70.     To access the Project site using the "Johnson Creek Route", MGI would travel from the City of Cascade on the paved "Warm Lake Road" for 34 miles; then on the native surface "Johnson Creek Road" for approximately 25 miles adjacent to Johnson Creek; and then on the native surface and gravel Stibnite Road for approximately 14 miles adjacent to the EFSFSR.

Lick Creek Route

71.     To access the Project site using the "Lick Creek Route", MGI would travel from McCall on "Lick Creek Road" for approximately 33 miles, the majority of which is native surface and gravel road adjacent to tributaries to the South Fork Salmon River, including Lick Creek and the Secesh River; then on the native surface and gravel East Fork and Stibnite roads for approximately 30 miles adjacent to the EFSFSR.

**MGI's Up to 43,800 One-Way Vehicle Trips to the Site**

72.     The Forest Service estimated that MGI would typically make 20 to 40 one-way vehicle trips to the Project site every day.  Thus, MGI could make up to 14,600 one-way vehicle trips per year—or up to 43,800 one-way vehicle trips over three years— along the transportation routes.

73.     Passenger vehicles, one-ton trucks, vans, and commercial transport trucks would transport MGI staff and supplies, such as fuel, drilling equipment, and tools, from Cascade for roughly 73 miles on the Johnson Creek Route and 85 miles on the South Fork Salmon River Route.  Other personnel and supplies could be transported to the site

from McCall for roughly 63 miles on the Lick Creek Route.  Some MGI staff would

commute daily from Yellow Pine to the Project site for 14 miles on the Stibnite Road.

74.     MGI's ability to use each route depends on seasonal road conditions and

on what is being transported.  Typically, during winter conditions, the Johnson Creek and

Lick Creek Routes are unplowed and closed, and the South Fork Salmon River Route is

the only route to the Project site.  During snow-free conditions, all of MGI's vehicle trips

are allowed to take place on any of the three transportation routes except for fuel

deliveries, which are limited as described below.

**MGI's Nearly 1,000 Fuel Truck Trips to the Site**

75.     The Forest Service's EA and DN/FONSI use subjective and imprecise

terms to describe the seasonal periods during which MGI would be authorized to

transport its trucks with fuel to the Project site.  The EA includes what is called the

"Petroleum Risk Assessment and Risk Reduction Procedures", which provides some

details on MGI's fuel transportation procedures, and is the basis for the following

information on fuel truck trips.

76.     MGI plans to deliver around one million gallons of fuel to the Project site

each year, or three million gallons over the three-year Project.  MGI would make up to

nearly 1,000 fuel truck trips.  Most fuel trips would use trucks each carrying 4,000

gallons of fuel.  Some fuel trips would use trucks each carrying 500-gallons of fuel.  All

fuel truck trips would take place on the two transportation routes from Cascade (no fuel

would be hauled on the Lick Creek Route from McCall).  The route used and the amount

of fuel hauled by each truck would depend on the season, as described below.

Snow-free Period

77.     During the "Snow-free Period", MGI would use the Johnson Creek Route to haul fuel in trucks carrying 4,000 gallons of fuel each.  MGI would make two fuel convoy trips per week, with two to four fuel trucks in each convoy.  The Snow-free Period is estimated to last 26 weeks from around June through November.  Thus, over the three-year Project life, MGI would make 312 to 624 fuel truck trips during the Snow-free Period.

Winter Period

78.     During the "Winter Period", when the Johnson Creek Route is closed due to snow, MGI would continue to haul fuel in trucks each carrying 4,000 gallons of fuel but would use the South Fork Salmon River Route.  MGI would make two fuel convoy trips per month, with two to four fuel trucks in each convoy.  The Winter Period is estimated to last 16 weeks from around December through March.  Thus, over the three-year Project life, MGI would make 48 to 96 fuel truck trips during the Winter Period.

Spring Break-up Period

79.     During the "Spring Break-up Period", MGI would use the South Fork Salmon River Road and Johnson Creek routes to haul fuel.  Because of road weight restrictions during spring break-up, MGI would use trucks carrying only 500 gallons of fuel each.  However, MGI would transport fuel more frequently than during the other periods.  MGI is authorized to make at least one fuel convoy trip seven-days-a-week with one fuel truck in each convoy.  The Spring Break-up Period is estimated to last 10 weeks from around mid-March through May.  It is also estimated that MGI would deliver 10,000 to 40,000 gallons of fuel during the Spring Break.  Thus, over the three-year

Project life, MGI would make 60 to 240 fuel truck trips during the Spring Break-up Period.

**Increased Sediment Delivery from Roads to Streams and Adverse Impacts to Fish**

Sediment Impacts to Fish Generally

80.     Sediment delivery and related turbidity adversely impact migrating, spawning, and rearing Chinook salmon, steelhead, and bull trout, and their habitat.  Fish population abundance, distribution, and survival have been linked to levels of turbidity and silt deposition.

81.     Sediments can fill interstitial spaces in the stream channel as they settle out of suspension.  Sediment deposits may cause mortality to incubating salmon eggs. Relatively small increases in sediment levels in streams have been shown to reduce egg survival.  Sediment deposition can suffocate eggs, effectively reducing spawning and rearing habitat for fish and diminishing habitat for prey species.

82.     Suspended sediments cause turbidity in water.  Turbidity plumes can cause salmonids and bull trout to avoid affected reaches in the stream and suspended sediments can physically abrade gill surfaces. Turbid water also results in a stress response in salmonids which may result in reduced growth, reduced ability to tolerate additional stressors, compromised immune system, impaired out-migration behavior, and reduced osmoregulatory competence, all of which further decrease survival rates.

Historical Sediment Problems in the South Fork Salmon River Watershed

83.     Elevated sediment levels have been identified as the major limiting factor for the natal habitat of Chinook salmon and steelhead populations in the South Fork Salmon River watershed.  The Payette and Boise National forests have one of the longest

running sediment data sets, documenting the percent of fine sediment at traditional spawning areas from 1975 to the present.  The South Fork Salmon River and the EFSFSR are listed by the Idaho Department of Environmental Quality (IDEQ) as impaired under the Clean Water Act due to excess sediment.  While Johnson Creek is not currently listed as impaired due to excess sediment, it has been listed as impaired due to sediment in the recent past.  EPA has found, and IDEQ and NOAA have recognized, that the high road densities found in the South Fork Salmon River Watershed are the primary source of anthropogenic-caused sediment entering these rivers.

<u>Increased Vehicle Traffic Increases Sediment Delivery from Roads to Streams</u>

84.    It is well known that increased traffic brings about an increase in sediment delivery to adjacent streams.  Generally, sediment yield from a road to a stream increases when a road is closer to a stream, when road gradient increases, when motorized use increases, when a road has an unpaved or unimproved surface, and when a road is not properly maintained.

85.    Forest roads may be constructed of native (dirt), gravel, or paved surfaces. Native surface roads usually yield the most sediment, followed by gravel roads, and then paved roads.  When native and gravel road surfaces are in use, they constitute a continually renewed source of sediment.  Vehicle traffic not only abrades and fractures the surfacing gravels but also forces gravels into substrate where the substrate is removed by overland flow generated on the road.  Heavily-used gravel roads have been found to contribute 130 times as much sediment as unused (abandoned) gravel roads.

86.    Vehicle traffic on unpaved roads during the spring break up period causes even further problems.  Vehicular traffic on muddy, slushy, or icy unpaved roads—

especially heavy truck traffic—may result in rutting and other negative impacts that exacerbate sediment generation and mobilization.

87.    Road repair and maintenance are important factors impacting sediment delivery.  The failure to properly repair and maintain roads can increase sediment delivery.  Repair or maintenance work can itself cause sediment delivery.

Sediment Generated by MGI's Up to 43,800 Vehicle Trips

88.    MGI's up to 43,800 one-way vehicle trips to the Project site would mobilize and deliver sediment to the South Fork Salmon River, Johnson Creek, EFSFSR, and other streams adjacent to the three transportation routes.  The majority of all vehicle miles travelled would be in close proximity to these streams and on native-surface or gravel-surface roads.

89.    All vehicle trips to the Project site would require at least travelling the Stibnite Road for 14 miles from Yellow Pine.  This road segment is unpaved (approximately one-third native and two-thirds gravel surface), and around 78 percent of this stretch is within 300 feet of the EFSFSR or other streams—and therefore within Chinook, steelhead, and bull trout designated critical habitat.

90.    While some of MGI's vehicle trips would make only this 14-mile trip from Yellow Pine to the Project site and back, the rest of the trips would originate much farther away in Cascade or McCall and would use MGI's three transportation routes to access the Project site.  All of MGI's nearly 1,000 fuel truck deliveries would originate in Cascade and travel around 70 or 80 miles to reach the Project site.

91.    The Johnson Creek Route from Cascade includes a 39-mile stretch on the Johnson Creek and Stibnite roads.  Over 99 percent of this 39-mile stretch is unpaved,

and over half of the unpaved portions are native surface.  According to the EA, 65 percent of this 39-mile stretch is within 300 feet of a stream, including Johnson Creek and the EFSFSR, and therefore within Chinook, steelhead, and bull trout critical habitat.

92.     The South Fork Salmon River Route from Cascade includes a roughly 61-mile stretch on the paved South Fork Salmon River Road for 32 miles and the unpaved East Fork and Stibnite roads for approximately 29 miles.  According to the EA, 89 percent of this 61-mile stretch is within 300 feet of a stream, including the South Fork Salmon River and EFSFSR and therefore within Chinook, steelhead, and bull trout critical habitat.  The 29-mile stretch on the East Fork and Stibnite Roads is unpaved, primarily native surface.  The majority of this 29-mile stretch is within 200 feet of the EFSFSR or other streams.

93.     The Lick Creek Route from McCall uses the Lick Creek, East Fork, and Stibnite roads, each of which is unpaved.  For approximately 16 miles from Lick Creek Summit to the East Fork Road, the Lick Creek Road is almost entirely native surface and in close proximity to Lick Creek and the Secesh River.  Then, this route follows the unpaved East Fork and Stibnite roads for approximately 29 miles.

**Risk of Fuel Spill into Streams and Adverse Impacts to Fish**

94.     MGI traffic on the two fuel haul routes would increase the risk of a fuel spill into adjacent streams.  The roughly 73-mile Johnson Creek and 85-mile South Fork Salmon River routes are on narrow, winding mountain roads with inclement weather conditions.  The majority of each route travels adjacent to streams where ESA-listed fish are present year round, and both routes make numerous stream crossings.

95.     Causes of accidents include road traffic, road surface conditions, weather conditions, flooding, and soft road shoulders, as well as human error and mechanical failures.

96.     Fuel is a contaminant that in sufficient concentrations is toxic to Chinook salmon, steelhead, and bull trout and to prey organisms that these fish depend on. Contaminants can alter oxygen diffusion rates and cause acute and chronic toxicity to aquatic organisms, reducing growth and survival and/or leading to mortality.  Free oil and emulsions can adhere to gills and interfere with respiration, and heavy concentrations of oil can suffocate fish.

**Prior Agency Restrictions on Road Use to Protect Fish from Impacts of Sediment Delivery and Fuel Spills**

97.     The Forest Service, NOAA, and FWS have previously acknowledged the unique significance of the South Fork Salmon River Watershed to ESA-listed fish and the serious threats to these fish from sediment delivery and fuel spills caused by vehicle use and fuel haul on MGI's transportation routes.

Forest Service and NOAA Restrictions on the South Fork Salmon River Road

98.     In coordination with NOAA in the 1990s, the Forest Service amended the Payette Forest Plan to include road maintenance and transportation management plans to reduce adverse impacts to fish from sediment delivery and the risk of a fuel spill from use of the South Fork Salmon River Road.  Ultimately, among other restrictions, the Forest Service limited all commercial fuel haul on the South Fork Salmon River Road to a maximum of 500 gallons of fuel at one time.

99.     In its 1990 Record of Decision for the EIS for the South Fork Salmon River Road Project, the Forest Service described that the "South Fork Salmon River

(SFSR) contains the most important remaining habitat for summer chinook salmon in the Columbia River Basin," but Chinook "numbers have been drastically reduced" and "critically important summer Chinook habitat in the SFSR drainage has been seriously degraded by a combination of natural and man-caused erosion and consequent deposition of sediment which significantly reduces Chinook egg and juvenile survival." *Id.* at 1.

100.    The two primary objectives of the Forest Service's South Fork Salmon River Road Project were to reduce sediment delivery to the river while still maintaining motorized access.  To meet these objectives, the Forest Service would allow the South Fork Salmon River Road to remain but required that it be paved and imposed other management restrictions, including road maintenance requirements and a transportation plan aimed at addressing sediment delivery and the risk of fuel spills.

101.    In the transportation plan, the Forest Service limited all commercial fuel haul on the South Fork Salmon River Road to a maximum of 500 gallons at one time. The Forest Service explained that "[t]he basic intent is to eliminate all fuel and other hazardous material haul on the South Fork road unless absolutely necessary." *Id.* at E-1.

102.    Similarly in 1995, as recommended during ESA consultation with NOAA to further lower the risk from fuel spills on the South Fork Salmon River Road, the Forest Service limited non-commercial fuel haul to a maximum of 60 gallons at one time, unless otherwise authorized by permit.

103.    The Forest Service and NOAA have continued to restrict or prohibit fuel haul on the South Fork Salmon River Road.  For example, around 1995, the Forest Service issued a Special Use Permit to Stibnite Mining Inc., authorizing it to transport supplies to the site, including approximately 620,000 gallons of diesel fuel per year to the

in trucks carrying 4,000 gallons at a time.  That permit prohibited Stibnite Mining from using the South Fork Salmon River Road for any commercial traffic, including the 4,000-gallon fuel haul trucks, unless special emergency approval was granted by the Forest Service.

104.    As recently as 2012, the Forest Service continued to limit fuel haul on the South Fork Salmon River Road to below 500 gallons in approving MGI's Plan of Operations for the Golden Meadows Winter and Summer 2012 Exploration Project.

105.    Now, however, the Forest Service has authorized MGI's fuel deliveries on the South Fork Salmon River Road using trucks carrying 4,000-gallons of fuel.  MGI would make around 48 to 96 of these deliveries over the three-year Project, and all of these deliveries would take place during winter, when the road is often icy or snowy and is in need of regular plowing.

Forest Service and NOAA Restrictions on the Johnson Creek and Stibnite Roads

106.    In the 1990s, NOAA and the Forest Service conducted a formal ESA consultation for Stibnite Mining's Special Use Permits to deliver fuel to the Project site and Stibnite Mining's Garnet Pit Mining Project at the site.  Stibnite Mining planned to haul 620,000 gallons of diesel fuel per year on the Johnson Creek Route in trucks carrying 4,000 gallons each.  The Forest Service and NOAA found that Stibnite Mining's fuel haul plan was likely to adversely affect Chinook salmon and destroy or adversely modify its critical habitat.  Therefore, NOAA prepared a full Biological Opinion titled "NOAA's Biological Opinion for Authorizations for Stibnite Mining Inc. Commercial Road Use Permits and Garnet Pit Mining (June 29, 1995)" (the Stibnite BiOp).

107.     According to NOAA: "Previous SMI mining activities have caused significant water quality problems, such as increased cobble embeddedness, turbidity, and chemical pollution, that have negatively affected . . . chinook salmon and essential features of their critical habitat in the upper EFSFSR and several of its tributaries.  The combination of these environmental impacts extends for several miles along the EFSFSR and are life threatening for the Chinook salmon inhabiting these waters."  *Id.* at 34. NOAA also explained that the accumulation of arsenic had been found in steelhead trout in the EFSFSR and indicated that sediments and/or water quality could be negatively affecting rearing Chinook salmon in the EFSFSR.

108.     In the Stibnite BiOp, NOAA concluded that the adverse impacts of Stibnite Mining's proposal, including the added sediment and risk of a fuel spill from using the Johnson Creek Route, were likely to jeopardize the continued existence of Chinook salmon and adversely modify its critical habitat.  Through the BiOp, NOAA imposed restrictions which would allow the project to proceed and avoid jeopardy by reducing these impacts.

109.     With respect to fuel spills, NOAA described the Johnson Creek Route as "40 miles of steep, narrow, winding native surface road, much of which is within 200 feet of Johnson Creek or the EFSFSR."  *Stibnite BiOp*, p. 13.  NOAA found that if a large diesel spill were to occur on this route, it could kill all Chinook salmon and eggs for several miles downstream of the accident.  NOAA reviewed accident information and found seven accidents from 1987 and 1993 involving vehicles hauling fuel and other toxic substances to the site, including four accidents resulting in diesel fuel spills.

110.     NOAA concluded that under good haul conditions, the transport of toxic substances was not likely to result in an accidental spill, but that "when occasional hazardous driving conditions or road use occurs, the transport of toxic substances to [the Stibnite Mine site] poses a significant threat to chinook salmon and their habitat." *Id.* at 38–39.  Thus, to lower the risk of hazardous substance spills, NOAA required the Johnson Creek Route to be closed during inclement weather and during poor road hauling conditions, and NOAA prohibited all fuel and other hazardous substance transport to the site beginning October 1 "when weather conditions heavily influence the driving surface." *Id.* at 39.

111.     With respect to sediment, NOAA found based on the Forest Service's BA and other information that mine-related roads were causing an excessive amount of erosion, and that sediment from this erosion was entering nearby streams.  NOAA evaluated traffic information provided by the Forest Service and determined that Stibnite Mining's traffic constituted a majority of all traffic on the Johnson Creek and Stibnite roads.  From this information, NOAA concluded that the majority of sediment delivery coming from those roads was attributable to Stibnite Mining.  NOAA explained that Best Management Practices were only partially effective in stopping roads from eroding into streams, particularly where soils are highly erodible, slopes are steep, and roads are close to streams.  And NOAA found that SMI-caused turbidity and siltation was negatively affecting Chinook salmon spawning and rearing habitat in the EFSFSR.

112.     NOAA also found that the EFSFSR has highly erodible soils, steep terrain, and roads in close proximity to its river banks and tributaries, and that the natural background level of sediment is likely very near the annual sediment bedload that the

EFSFSR can carry without increasing the annual deposit of fine sediment onto its streambed.  NOAA thus concluded that "relatively small increases in the amount of sediment entering the EFSFSR could result in a significant rise in the total amount of sediments deposited in the streambed." *Id.* at 20.  To avoid jeopardy, NOAA identified eight measures to be followed to reduce erosion on the mining haul roads and 15 measures for the access roads, including closing roads to heavy truck traffic during wet-weather, not using roads when water is seen running down them, undertaking numerous road improvement projects, and following a variety of road maintenance practices.

113.     In contrast, now, the Forest Service has used an EA and DN/FONSI to approve MGI's plan to use this same route to deliver similar quantities of fuel without requiring that the same precautions be followed.  And instead of formal consultation, NOAA issued a Letter of Concurrence allowing the Project to proceed as proposed.  Like Stibnite Mining, MGI would use trucks carrying 4,000-gallons of fuel on the Johnson Creek Route, but MGI's Johnson Creek Route deliveries are not limited to the 25-week window of suitable conditions previously required by NOAA.  Rather, MGI would deliver fuel to the Project site year-round, even during wet and other inclement weather.  And instead of requiring specific road repairs and maintenance as part of the Project, the agencies have taken a hands-off approach and rely on a future road maintenance agreement, with unknown terms, as well as existing road maintenance guidelines that were never presented and assessed in the EA or LOC.

FWS's Concerns Over Sediment from Roads in the Watershed

114.     FWS has acknowledged the threat that sediment from increased road use poses to bull trout in the South Fork Salmon River Watershed.  For example, in FWS's

May 2009 Biological Opinion for the Potential Effects of Managing the Payette National Forest in the South Fork Salmon River Watershed, FWS recognized that travel and sedimentation will increase on roads within the Watershed.  FWS also recognized that increased sediment may adversely affect bull trout habitat, particularly for juvenile fish that may abandon or avoid habitat due to increased sediment.  Yet here, even though MGI's Project would cause a substantial increase in traffic on roads directly adjacent to streams in the South Fork Salmon River Watershed, FWS issued a Letter of Concurrence without even considering sediment impacts.

**The Forest Service's EA & DN/FONSI for the Project**

115.     In the EA, the Forest Service admitted that sediment generated by MGI's exploration activities at the Project site poses "the greatest risk for impacts to surface waters . . . from exploration activities such as the construction of drill pads, road constructions, or vehicle access to drilling or reclamation areas."  *EA*, p. 3-32.  But the Forest Service failed to even consider sediment delivery from MGI's use of the transportation routes.

116.     Nowhere does the EA or DN/FONSI disclose baseline information on existing vehicle use of the transportation routes, or existing sediment deposition and turbidity in streams adjacent to the transportation routes.  And nowhere does the EA provide any objective quantitative evaluation of the increase in sediment and turbidity and related impacts to aquatic life which may be caused by MGI's up to 43,800 vehicle trips to the Project site on these roughly 60-, 70-, and 80-mile routes.  So the impacts of increased Project traffic are unknown.

117.    Sedimentation and turbidity are particularly problematic during spring break up when snow is melting and road conditions are poor.  The EA acknowledges that spring break up lasts for around two and a half months, yet the Forest Service failed to evaluate and disclose the impacts of MGI's vehicle use on the transportation routes during spring break up, including MGI's daily fuel truck trips.  And road conditions are poor and subject to causing more sedimentation and turbidity during high intensity storms and flooding, which are not limited to the spring breakup period.  But the Forest Service never analyzed the impacts of MGI's increased traffic during inclement weather.

118.    Rather than performing an objective quantification of sediment impacts through an evaluation and disclosure of sediment generation and mobilization along the haul routes, the Forest Service relied instead on standard operating procedures (SOPs) to account for some sediment impacts caused by the Project.  These SOPs do not apply to most of the transportation haul routes associated with the Project.  The Forest Service also excludes many of the SOPs from the proposed action and concedes in the DN/FONSI that the agency lacks or has limited authority with regard to those SOPs.

119.    In the EA, the Forest Service admitted that fuel haul poses a risk to fish due to transporting fuel on narrow, winding mountain roads with periodic inclement weather.  And the Forest Service acknowledged that the two fuel haul routes parallel and cross streams with important spawning areas and areas important to the life cycle of ESA-listed species.  The Forest Service never disclosed baseline accident levels on these routes and never evaluated the increased risk of an accident due to MGI's substantial increase in traffic.  Instead, the Forest Service relied on the "Petroleum Risk Assessment"

in the EA to claim the risk would be minimal, even though that Assessment does not actually include any risk assessment.

120.    The Forest Service also never explained why the risks of delivering fuel on the South Fork Salmon River Road that led to the 500-gallon limit over the last two decades are no longer a concern.  Now, the Forest Service would allow MGI to deliver eight times the limited amount, and all during winter when driving conditions are often poor.  Similarly, the Forest Service never considered or explained why the seasonal and wet-weather closures required to lower the fuel spill risk from Stibnite Mining's fuel deliveries on the Johnson Creek Route could be disregarded here without creating a significant risk.

121.    Road maintenance and repairs are important factors in controlling road safety and in limiting existing sediment from the transportation routes.  But the Forest Service failed to identify what, if any, maintenance was required on the different road segments of the transportation routes.  The EA and DN/FONSI indicate that MGI would work with Valley County to develop a road maintenance agreement on the Stibnite Road from Yellow Pine to the Project site.  But this agreement is expressly not part of the proposed action and on information and belief is not yet executed.  Without this agreement, there is no way for the Forest Service or the public to evaluate the likelihood and effectiveness of any road maintenance along this important 14-mile stretch of road that would be used for all of MGI's 43,800 vehicle trips.  Furthermore, the Forest Service failed to identify what, if any, road maintenance would occur on the other stretches of each of the three transportation routes, including along the Lick Creek, South Fork Salmon River, and Johnson Creek roads.  And the Forest Service never evaluated

whether any such maintenance would be able to accommodate MGI's 14,600 annual vehicle trips.

122.    The Forest Service failed to consider the cumulative impacts of the Project with all past, present, or reasonably foreseeable future activities under NEPA.  For example, the Forest Service failed to consider the impacts of another mining exploration project—the Golden Hand Project.  Fuel hauling and other traffic for the Golden Hand Project will overlap with MGI's transportation routes, and increase the sediment delivery and risk of a fuel spill to adjacent streams.  But the Forest Service never mentioned vehicle traffic from the Golden Hand project in the EA or DN/FONSI and never evaluated increased sediment deposition and turbidity and risk of a fuel spill due to the combined fuel hauling of Golden Meadows and Golden Hand.

123.    The Forest Service also failed to adequately consider the continuing water quality impacts from previous mining activities in the EFSFSR Watershed.  A substantial area in the watershed is disturbed and continues to deliver sediment to nearby streams. And numerous contaminated areas exist, and are causing or pose a threat of metal and other contamination.  The Forest Service fails to properly disclose and consider these ongoing problems when considering the incremental impact of MGI's Project.

124.    The Forest Service also failed to adequately consider the potential impacts the Project may have as a result of encountering existing disturbed areas, contaminated areas, and other features from past mining.  For example, the Forest Service acknowledged that underground and above-ground mine workings throughout the Project site include numerous tunnels, adits, shafts, open pits, tailings disposal area, and a waste-rock dump.  However, the Forest Service failed to adequately evaluate how these mine

workings affect current geologic, soil, groundwater hydrology and other environmental conditions in the Project area or how MGI's activities would affect or be affected by these existing mine workings.

125.    The Forest Service also failed to consider the impacts of MGI's activities occurring on non-federal land.  The Forest Service identified MGI's borrow source area, temporary camp, water infrastructure, wastewater treatment, and drilling activities as non-federal connected actions.  But in the EA, the Forest Service never evaluated the impacts of these connected actions.

126.    Additionally, in evaluating the effects of the Project and making its Finding of No Significant Impact, the Forest Service relied on numerous "standard operating procedures" (SOPs) that MGI could undertake.  However, the Forest Service conceded that these SOPs are not part of the proposed action and that the agency "lacks or has limited authority with regard to these SOPs."

127.    Plaintiffs requested that the Forest Service develop and evaluate potential alternative courses of action in the EA which would still allow MGI to pursue its exploration.  One recommended alternative was to consider limiting MGI's drilling operations in sensitive areas to winter time only in order to reduce sediment delivery to streams.  Another alternative would have considered prohibiting fuel haul during spring breakup.  Another would have considered using different fuel haul routes to minimize the risk of a fuel spill.  Another would have examined using snow cats to haul fuel along the Johnson Creek Road during winter rather than hauling fuel on the South Fork Salmon River Road.  Another would have considered stockpiling fuel during the summer months when road conditions may be most suitable for fuel haul.  Another would have

considered further limiting the number of drill pads within ecologically important Riparian Conservation Areas (RCAs).  Another would have considered a variety of actions to minimize impacts of the Project.  But the Forest Service refused to develop any of these alternatives and evaluated only MGI's proposal.  Although the EA included a No Action alternative, the Forest Service maintained in the EA that the No Action alternative is inconsistent with the authority contained in the Mining Act of 1872.  As a result, the Forest Service only meaningfully considered the proposed action and did not develop any viable alternatives

**ESA Consultation**

The Forest Service's BA

128.    The Forest Service prepared a Biological Assessment (BA) for the Project. The Forest Service submitted the BA to NOAA and FWS in or around August 2012, initiating ESA consultation.  In the BA, the Forest Service found that the Project may affect Chinook salmon, steelhead, bull trout, and their critical habitat, but that the Project was not likely to adversely affect these species or their critical habitat.

129.    The Forest Service admitted that increased traffic on the unpaved transportation routes within 300 feet of streams, as well as related road construction, maintenance, and plowing on all routes, generally cause sediment deposition and turbidity.  The Forest Service also admitted that sediment deposition and turbidity can adversely impact Chinook salmon, steelhead, and bull trout.  However, in its analysis of potential effects, the Forest Service considered only MGI's use of roads at the Project site and failed to evaluate sediment deposition and turbidity from MGI's 43,800 vehicle trips to the site using the three transportation routes.

130.    The Forest Service also admitted in the BA that fuel haul in close proximity to streams creates the risk of a fuel spill and explains that fish would be adversely affected by a fuel spill.  However, the BA simply states that the risk of a spill is "relatively low" without explaining what this level of risk is and without providing any basis for the evaluation of the risk.

NOAA's LOC

131.    Instead of preparing a full Biological Opinion through formal consultation, NOAA issued a Letter of Concurrence (LOC) concluding its ESA consultation process with the Forest Service.  In the LOC, NOAA concurred with the Forest Service's findings in the BA that the Project may affect but is not likely to adversely affect Chinook salmon or steelhead or destroy or adversely modify their designated critical habitat.

132.    NOAA recognized that the Project would require deliveries of large quantities of fuel on the transportation routes.  NOAA admitted MGI's increased vehicle use of the transportation routes could affect Chinook salmon and steelhead at all life cycles stages through increased sediment generation and mobilization and the introduction of toxic chemicals.  NOAA also admitted that MGI's increased vehicle use on the transportation routes is "likely to generate and mobilize sediments."  But NOAA claimed that the project would cause no measurable increase in sediment deposition or turbidity to streams along the transportation routes because MGI would follow certain SOPs and the transportation routes would receive routine road maintenance.

133.    NOAA, however, provided no documentation showing whether and how each stretch of the three transportation routes would be routinely maintained, and never explained how such maintenance could diminish sediment delivery from MGI's 43,800

one-way vehicle trips to non-measurable levels.  NOAA never reconciled its conclusion in the LOC with its findings in the 1995 Stibnite BiOp where NOAA found that similar vehicle activity constituted the primary source of sediment from these roads, that road maintenance BMPs have limited effectiveness, and that even small increases in sediment to these streams may have significant impacts to fish.

134.    NOAA also stated that most roads associated with the Project are pre-existing and in stable condition and that sediment generation and mobilization would be low.  NOAA did not base this statement on any objective, quantitative sediment analysis from the transportation haul routes; and by asserting that the roads are in stable conditions, NOAA ignored the fact that significant sections of the transportation routes are native surface (dirt) or graveled.

135.    NOAA also admitted that because MGI would transport large quantities of fuel, there is the potential for an accidental spill into the riparian zone.  NOAA claimed, however, that the risk of chemical contamination would be very low, relying on certain precautions MGI would take.  However, NOAA provided no basis for concluding the risk would be very low.

136.    NOAA failed to explain why the previous 500-gallon fuel haul limit on the South Fork Salmon River Road can now be substantially exceeded by MGI with a very low risk, especially since MGI would make 4,000-gallon deliveries all during the winter. NOAA also failed to explain why the important seasonal and wet-weather closures of the Johnson Creek and Stibnite roads to fuel haul that it imposed via the 1995 Stibnite Mining BiOp are not necessary now for MGI's similar fuel haul plan.

FWS's LOC

137.    FWS also issued an LOC instead of a full Biological Opinion concluding its ESA consultation process with the Forest Service.  In the LOC, FWS concurred with the Forest Service's findings in the BA that the Project may affect but is not likely to adversely affect bull trout or destroy or adversely modify designated critical habitat.

138.    FWS' LOC completely failed to acknowledge the transportation routes, MGI's increase in traffic along those routes, and the presence of bull trout within critical habitat in adjacent streams.  FWS said nothing about the risk of a fuel spill or its potential impacts.  FWS ignored sediment deposition and turbidity attributable to MGI's use of the transportation routes and never addressed its findings from the May 2009 Biological Opinion for the Potential Effects of Managing the Payette National Forest in the South Fork Salmon Watershed that increased traffic causes sedimentation and may have adverse impacts to bull trout.

139.    With respect to sediment, FWS simply stated without explanation that MGI's BMPs would "reduce potential sediment delivery to streams to negligible amounts."  But FWS failed to recognize that these BMPs apply to activities at the Project site, and would not reduce sediment delivery caused by MGI's tens of thousands of vehicle trips along the roughly 60-, 70-, and 80-mile transportation routes.

**FIRST CLAIM FOR RELIEF:**
**Forest Service NEPA Violations**

140.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

141.    This First Claim for Relief challenges the Forest Service's violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, in approving the Golden Meadows Exploration Project based

on the Project Record, EA, and DN/FONSI.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

142.    The Forest Service's EA and DN/FONSI violate NEPA's "hard look" requirement in multiple respects, including but not limited to the following:

a.    Failing to collect, evaluate, and disclose adequate baseline information, including but not limited to baseline information on sediment, turbidity, arsenic, and other pollutant conditions and sources in the South Fork Salmon River, Johnson Creek, and EFSFSR; baseline vehicle use and accident numbers for MGI's transportation routes; and baseline information on road conditions and repair and maintenance practices and requirements;

b.    Failing to collect, evaluate, and disclose any quantified or detailed information on increased sediment and turbidity in the South Fork Salmon River, Johnson Creek, and EFSFSR generated by MGI's 43,800 vehicle trips, as well as information on how this increased road use would impact ESA-listed fish species;

c.    Failing to collect, evaluate, and disclose quantified or detailed information on the increased risk of a fuel spill from making nearly 1,000 fuel truck trips to transport fuel around 70 or 80 miles to the Project site along the two fuel haul routes;

d.    Failing to consider all past, present, and reasonably foreseeable cumulative impacts, including but not limited to impacts of fuel haul and other vehicle use of the transportation routes for the proposed Golden Hand project, impacts from previous mining activities, and impacts from ongoing and future restoration work in the area; and/or

e.      Failing to consider a reasonable range of alternatives by refusing to adequately consider any of the viable alternatives proposed by Plaintiffs, including but not limited to alternatives to use different fuel haul routes, to prohibit fuel haul during spring break up period, to limit the number of drill pads in Riparian Conservation Areas, and to operate during winter only.

143.    The Forest Service further violated NEPA by approving the Golden Meadows Project based on the EA and DN/FONSI rather than preparing a full EIS to examine the potentially significant impacts of the approved exploration activities.  The Project's potential impacts are "significant" within the meaning of 40 C.F.R. § 1508.27(b), and therefore require an EIS for multiple reasons, including but not limited to:

a.      The potential environmental impacts from the Project are "highly uncertain or involve unknown risks" (40 C.F.R. § 1508.27(b)(5)) and/or "are likely to be highly controversial" (40 C.F.R. 1508.27(b)(4)) because the Forest Service failed to evaluate and disclose baseline data on sediment, turbidity, and vehicle accidents along the transportation routes; and baseline data or analysis on groundwater hydrology and other environmental conditions in the Project area given the substantial underground workings in the area from previous mining activities; and/or failed to evaluate or disclose reasonably detailed information or analysis on increased sediment, turbidity, and the risk of fuel spills from the Project and from the proposed Golden Hand exploration project;

b.      The Project "may adversely affect an endangered or threatened species or its habitat" (40 C.F.R. § 1508.27(b)(9)) because of increased sediment and turbidity and the risk of a fuel spill in streams adjacent to the transportation routes;

c. The South Fork Salmon River, Johnson Creek, EFSFSR, and their tributaries are "ecologically critical areas" (40 C.F.R. § 1508.27(b)(3)) providing uniquely important habitat for ESA-listed fish; and/or

d. Approval of the Project "may establish precedent for future actions with significant effects" (40 C.F.R. § 1508.27(b)(6)) by allowing similar fuel haul and vehicle trips along the transportation routes.

144. Therefore, the Forest Service's approval of the Golden Meadows Exploration Project is arbitrary, capricious, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA, and thus must be held unlawful and set aside under 5 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF:
### NOAA ESA Violations

145. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

146. This Second Claim for Relief challenges NOAA's violations of the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, and the ESA's implementing regulations, when it issued its Letter of Concurrence (LOC) for the Golden Meadows Exploration Project on October 18, 2013. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

147. NOAA's LOC determined that the Project may affect but is not likely to adversely affect Chinook salmon and steelhead or destroy or adversely modify their designated critical habitat, concluding ESA consultation between NOAA and the Forest Service. NOAA's LOC is arbitrary and capricious and/or not in accordance with law in numerous respects, including but not limited to:

a.      NOAA failed to consider any quantitative analysis to estimate the amount of sediment generation and mobilization caused by the Project's increased vehicle traffic and related maintenance and repair on the transportation routes when it concluded impacts would be discountable;

b.      NOAA inaccurately characterized most of the transportation route roads as pre-existing, stable, and unlikely to cause measurable increases in sediment and turbidity;

c.      NOAA failed to acknowledge that a substantial portion of the transportation route roads are within 300 feet of streams, including many portions which are within 200 feet;

d.      NOAA incorrectly assumed that Project-related transportation would not occur on highly erodible roads during spring break-up and other critical periods;

e.      NOAA relied on a future road maintenance agreement with Valley County to address documented problems with the transportation routes even though this agreement did not exist and was not part of the Proposed Action, and even though the agreement would address road maintenance on only the 14-mile Stibnite Road section of the roughly 60-mile, 70-mile, and 80-mile transportation routes;

f.      NOAA never explained why impacts would be negligible even though the 500-gallon fuel haul limit on the South Fork Salmon River Road would not be followed;

g.      NOAA never explained how the threats posed by MGI's 1,000,000 gallons of annual fuel haul would be less severe than those of Stibnite Mining's 620,000 gallons of annual fuel haul in 1995, even though MGI would not follow the same seasonal and wet-weather fuel haul closures and repair and maintenance requirements NOAA required of Stibnite Mining on the Johnson Creek and Stibnite roads;

h.      NOAA failed to include and analyze the additional impacts from other activities in the area and along the transportation routes, including but not limited to fuel haul and other traffic from the Golden Hand exploration project and MGI's private land activities.

i.      NOAA relied on future turbidity monitoring, even though monitoring is limited to the Project site and excludes many miles of ESA-listed fish bearing streams and designated critical habitat along the haul routes, much of which is either directly adjacent to or within 200 feet of ESA-listed fish bearing streams.

148.      Therefore, NOAA's LOC for the Golden Meadows Exploration Project is arbitrary, capricious, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA, and thus must be held unlawful and set aside under 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF:
### FWS ESA Violations

149.      Plaintiffs reallege and incorporate by reference all preceding paragraphs.

150.      This Third Claim for Relief challenges FWS's violations of the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, and the ESA's implementing regulations, when it issued its Letter of Concurrence (LOC) for the Golden Meadows Exploration Project on October 5, 2013.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

151.      FWS's LOC determined that the Project may affect but is not likely to adversely affect bull trout or destroy or adversely modify its designated critical habitat, concluding ESA consultation between FWS and the Forest Service.  FWS's LOC is

arbitrary and capricious and/or not in accordance with law in numerous respects, including but not limited to:

a.      FWS completely failed to consider the adverse impacts to bull trout of sediment delivery from MGI's 43,800 vehicle trips to the Project site;

b.      FWS never acknowledged its 2009 finding that increased traffic in the South Fork Salmon River Watershed would cause increased sediment and adversely impact bull trout;

c.      FWS failed to acknowledge the risk of a fuel spill to bull trout from MGI's nearly 1,000 fuel truck trips; and/or

d.      FWS relied on the Forest Service's inadequate BA, even though the BA never considered sediment delivery from MGI's up to 43,800 vehicle trips to the Project site and provided no reasonable, objective basis for determining the risk of a fuel spill would be low.

152.    Therefore, FWS's LOC for the Golden Meadows Exploration Project is arbitrary, capricious, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA, and thus must be held unlawful and set aside under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.      Order, declare, and adjudge that the Forest Service's EA and DN/FONSI for the Golden Meadows Exploration Project are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with NEPA in violation of the APA;

B.      Vacate, reverse, and remand the EA and DN/FONSI.

C.      Order, declare, and adjudge that NOAA's and FWS's LOCs for the Golden Meadows Exploration Project are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the ESA in violation of the APA;

D.      Vacate, reverse, and remand the NOAA and FWS LOCs;

E.      Enter such temporary, preliminary, or permanent injunctive relief as Plaintiffs may hereinafter seek;

F.      Award Plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation under the Equal Access to Justice Act and/or all other applicable authorities; and

G.      Grant such further and additional relief as the Court deems just and proper in order to remedy Defendants' violations of NEPA, the ESA, and the APA.

Dated this 22nd day of April, 2014.                      Respectfully submitted,

/s/_Bryan Hurlbutt_____
Bryan Hurlbutt

*Attorney for Plaintiff Idaho Conservation League*

/s/_Michael A. Lopez_____
Michael A. Lopez

*Attorney for Plaintiff Nez Perce Tribe*